The BEACON MUTUAL INSURANCE
COMPANY, Plaintiff,

v.

ONEBEACON INSURANCE
CORP., Defendant.

No. C.A.01–354S.

United States District Court,
D. Rhode Island.

July 15, 2005.

Michael A. Gamboli, Robert K. Taylor, Steven E. Snow, Partridge Snow & Hahn LLP, Providence, RI, for Plaintiff.

Brian J. Lamoureux, William M. Dolan, III, Brown Rudnick Berlack Israels LLP, Providence, RI, Dalila Argaez Wendlandt, Martha J. Collins, Steven A. Kaufman, Ropes & Gray, Boston, MA, for Defendant.

## DECISION AND ORDER

SMITH, District Judge.

### I. *Introduction*

The Beacon Mutual Insurance Company ("Plaintiff" or "Beacon") is the largest writer of workers' compensation insurance in the state of Rhode Island. It has used the name "The Beacon Mutual Insurance Company" (along with a lighthouse logo) since 1992. Meanwhile, OneBeacon Insurance Group ("Defendant" or "OneBeacon"), formerly known as CGU Insurance, adopted its current name, and began using a lighthouse logo as well, in June 2001. Following this name change, Beacon brought this lawsuit claiming that Defendant's adoption of the name "OneBeacon" and a lighthouse logo violated federal and state unfair competition law. Beacon also asserted claims for service mark infringement and trademark dilution under state law.

OneBeacon responded to Beacon's suit with a Motion for Summary Judgment, which this Court granted. *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group,* 290 F.Supp.2d 241 (D.R.I.2003) ("*Beacon I*"), *rev'd* 376 F.3d 8 (1st Cir.2004). In granting summary judgment, this Court relied primarily on the First Circuit's opinion in *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.,* 718 F.2d 1201 (1st Cir. 1983), which held that in order to find a likelihood of confusion between parties' marks sufficient to support a claim of unfair competition, that confusion *"must* be based on the confusion of some relevant person; i.e., a customer or purchaser," *id.* at 1206 (emphasis added). Because

"Plaintiff ha[d] not established that the [allegedly confused] entities and persons . . . are [ ] consumers of the product," *Beacon I*, 290 F.Supp.2d at 246, this Court concluded that Plaintiff failed "to demonstrate that the confusion it identifies is connected in any way to its commercial interests," *id.* at 252, as required to maintain an unfair competition claim.

On appeal, the First Circuit reversed. *Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8 (1st Cir.2004)("*Beacon II* "). Without addressing its earlier holding in *Astra* that the relevant confusion *must* be shown to exist in customers or purchasers, the First Circuit implicitly abdicated the *Astra* standard by concluding that evidence of actionable commercial injury in a case such as this was "not restricted to the loss of sales to actual and prospective buyers of the product in question." *Id.* at 10. Instead, the First Circuit enunciated a new standard for what constitutes actionable confusion: "Confusion is relevant when it exists in the minds of persons in a position to influence the purchasing decision *or* persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner." *Id.* (emphasis added). Further, "relevant commercial injury includes not only loss of sales but also harm to the trademark holder's goodwill and reputation." *Id.*

As a result of the First Circuit's decision, the case returned to this Court and a bench trial was held from February 28, 2005, to March 4, 2005, with final arguments on March 9, 2005. What follows are the Court's findings of fact and conclusions of law.

## II. *Findings of Fact and Conclusions of Law*

The marks that Plaintiff seeks to protect are not registered. "Therefore the present claim is based upon § 43(a) of the Lanham Act which covers unregistered trademarks." *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir.1993). Section 43(a) of the Lanham Act forbids persons from using,

in connection with any goods or services . . . any word, term, name, symbol, or device, or any combination thereof . . . which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A).

To make out a claim under § 43(a), the owner of an unregistered mark must establish that its mark is (1) either inherently distinctive or has acquired secondary meaning, and (2) is likely to be confused with the defendant's mark. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769–70, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

### A. *The Spectrum of Distinctiveness*

In analyzing whether a mark is distinctive, marks are divided into four categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). Suggestive, arbitrary and fanciful marks are considered inherently distinctive, while descriptive marks are deemed distinctive only upon a showing that they have acquired secondary meaning. *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 39 (1st Cir.1998). Generic marks are generally not protected. *Id.* Whether a mark is inherently distinctive is a question of fact. *Boston Beer*, 9 F.3d at 180.

To be classified as "fanciful," terms will usually have to have been "invented solely for their use as trademarks." *Abercrombie*, 537 F.2d at 11 n. 12. Arbitrary marks are "common word[s] ... applied in an unfamiliar way." *Id.* Suggestive marks "require imagination, thought and perception to reach a conclusion as to the nature of goods." 537 F.2d at 11 (quoting *Stix Prods., Inc. v. United Merch. & Mfrs., Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)). Finally, "[a] term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* (quoting *Stix Prods., Inc.*, 295 F.Supp. at 488).

Beacon's mark is most appropriately deemed descriptive. The word "beacon" in the mark is meant to suggest that Beacon will serve as a good guide to consumers. *See* Miriam–Webster's Collegiate Dictionary 98 (10th ed.2002) (defining "beacon" as a "signal for guidance" and "a source of light or inspiration"); *see also Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 728 (7th Cir.1998) ("In this instance, 'platinum' describes the quality of plaintiff's mortgage services and suggests that it provides a superior service...."); *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 (5th Cir.1974) (upholding a district court's conclusion "that the word 'heritage' is generic or descriptive of life insurance"); *Hiram Walker & Sons, Inc. v. Penn–Maryland Corp.*, 79 F.2d 836, 838 (2d Cir.1935) (holding that "imperial" was descriptive of quality of whiskey). The descriptive nature of the mark is confirmed by the widespread use of the term "beacon" with a lighthouse logo by many other companies around the country.[1] *See American Heritage Life Ins.*, 494 F.2d at

11 ("The industry itself evidently recognizes the truth of the district court's finding because the word 'heritage' is used in the corporate names of insurance companies all over the country."). Finally, Beacon itself has capitalized upon the descriptive significance of its mark by putting out a newsletter in the past entitled "Guiding Light." (Tr. of 2/28/05 at 85 (testimony of Michael Lynch, Vice President of Legal Services at Beacon).)

### B. *Proving Secondary Meaning*

Because Beacon's mark is descriptive, and therefore not inherently distinctive, Beacon must show secondary meaning to avail itself of the protection of the Lanham Act. A mark that is not inherently distinctive is protected under the Lanham Act only upon a showing by the mark owner, by a fair preponderance of the evidence, that the mark has acquired secondary meaning. *See* 2 J. Thomas McCarthy, McCarthy On Trademarks And Unfair Competition § 15:33 (4th ed.2005) (hereinafter, "McCarthy"). A mark has acquired secondary meaning only if its primary significance in the minds of the public is to identify the source of the product or service. *See I.P. Lund,* 163 F.3d at 41. Market surveys have "become a well-recognized means of establishing secondary meaning." *Boston Beer Co.,* 9 F.3d at 182. Other factors a court may look to "in determining whether a term has acquired secondary meaning are: (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection ... between the name ... and a particular product...." *Id.* (citation omitted).

---

1. For example, Sara Soubosky, a paralegal for the Defendant's law firm, Ropes & Gray, LLP, testified at trial that a search of the internet revealed 289 businesses in Massachu-

setts used the name Beacon, with ten of those businesses being in the financial/insurance industry, and five of those employing a lighthouse logo as well. (Tr. of 3/3/05 at 119.)

Beacon retained the services of Dr. Jacob Jacoby as an expert witness on secondary meaning. Dr. Jacoby produced a written report which concludes that the phrase "The Beacon," has acquired a substantial degree of secondary meaning among individuals in Rhode Island responsible for selecting their company's workers' compensation insurance and/or commercial or industrial insurance. (Pl.'s Ex. 406.) This conclusion is based upon the results of three surveys conducted in Rhode Island in the Fall of 2001. In these surveys, a total of 237 targeted respondents (persons who choose, or help to choose, the provider of workers' compensation or commercial/industrial insurance for their company) were asked what they thought of when they heard or saw the term "The Beacon." According to Jacoby, 69% of the respondents who heard and 79% of the respondents who saw the term "The Beacon" said that it signified a workers' compensation insurance company.

Dr. Jacob Jacoby's survey supports the conclusion that Beacon's marks have acquired secondary meaning.[2] Dr. Jacoby's survey demonstrates that individuals in Rhode Island responsible for, or influential in, selecting their company's workers' compensation insurance and/or commercial or industrial insurance are familiar with Beacon's name and lighthouse logo, and that they associate it with a particular source of workers' compensation insurance.

OneBeacon argues that since Beacon has surveyed a narrower population of persons for purposes of establishing secondary meaning (those individuals likely to influence purchasing decisions) than that in which it is looking to establish a likelihood of confusion (the general public), Beacon should be precluded from relying on its survey evidence or, in the alternative, the evidence of confusion among the general population should be accorded less probative value. In support of this contention, counsel for Defendant, in his closing argument, stated that a highly respected commentator, J. Thomas McCarthy, has written that the respective universes "must" match. (Tr. of 3/9/05 at 89.) However, a reading of the cited source discloses no such assertion. Rather, McCarthy merely recognizes that there is "interdependence between buyer confusion and secondary meaning." 2 McCarthy § 15:11. Thus, the "basic principle is that if there is no secondary meaning, there is no mark to protect and confusion is not possible." *Id.* This has been understood to mean that "proof of secondary meaning is a condition precedent to any discussion of likely confusion." *Universal Frozen Foods, Co. v. Lamb–Weston, Inc.,* 697 F.Supp. 389, 394 (D.Or.1987). This is a far cry from requiring that the respective populations for establishing secondary meaning and likelihood of confusion must be identical.

2. OneBeacon challenges Dr. Jacoby's methodology in conducting the survey on a number of grounds. However, after an extensive *Daubert* hearing on this matter, this Court concluded Dr. Jacoby's survey evidence constitutes admissible expert testimony. *Beacon Mut. Ins. Co. v. Onebeacon Ins. Group,* 253 F.Supp.2d 221 (D.R.I.2003). OneBeacon also challenges Dr. Jacoby's survey on the ground that it only tested the term "The Beacon," while Plaintiff here is claiming infringement of "The Beacon," "Beacon Insurance," and "The Beacon Mutual Insurance Company."

(*See* Def.'s Mot. to Exclude Evidence Relating to Marks other than "The Beacon.") The Court concludes Dr. Jacoby's explanation for constructing the surveys as he did makes sense and denies Defendant's motion. (*See* Pl.'s Ex. 406 at 6 ("Because the entire name, The Beacon Mutual Insurance Company, actually tells the respondent that it refers (1) to a company, and (2) that that company is an insurance company, no effort was made to test whether the full name effectively communicates that it is the name of an insurance company.").)

OneBeacon acknowledges that it knows of no case that expressly endorses its position on this point. OneBeacon does, however, cite to one case that seemingly advances the proposition. In *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373 (2d Cir.1997), the Second Circuit recognized that "[t]he likelihood of confusion test concerns not only potential purchasers but also the general public," *id.* at 382. The court went on to note, however, that "such third parties are only relevant if their views are somehow related to the goodwill of the aggrieved manufacturer." *Id.* at 382–83. The court concluded that "where there is no showing that the general public is aware of Landscape's 'dress,' the district court erred in giving this factor great weight." *Id.* This language could possibly be read to imply that secondary meaning must be demonstrated as to the particular population in which likelihood of confusion is to be shown.

 Nonetheless, the most generally accepted law is that: (1) secondary meaning is determined on the basis of *purchaser* perception, *see Am. Assoc. for the Advancement of Science v. Hearst Corp.*, 498 F.Supp. 244, 257 (D.D.C.1980) ("The question is not whether the general public, but the *relevant buyer class* associates a name with a product or its source.") (citing 1 McCarthy § 15:11) (emphasis in original), and (2) non-purchasers are relevant for purposes of finding an actionable likelihood of confusion, *see Beacon II*, 376 F.3d at 10 (including anyone "whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner"). Thus, Plaintiff may establish secondary meaning via a survey of those individuals "likely to influence purchasing decisions," while establishing likelihood of confusion among a broader population. *See Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125, 128 (4th Cir.1990) (recognizing that likelihood of confusion may be demonstrated via a group made up

of "the public, but not typical purchasers," while describing secondary meaning as based upon "the *consuming* public's understanding") (emphasis added). This Court has found nothing to suggest that the 1962 amendment of the Lanham Act, which broadened actionable confusion beyond that of purchasers was intended to change the standards for proving validity of a descriptive mark (i.e., establishing secondary meaning in the consuming public). *See Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 989 (Fed.Cir.1993) ("Section 32 of the Lanham Act was amended in 1962 to include confusion of nonpurchasers as well as direct purchasers by striking out language limiting its scope to confusion of 'purchasers as to the source of origin of such goods or services.' ").

Even if this Court did not find secondary meaning by virtue of the Jacoby market survey evidence, Beacon would be able to establish secondary meaning on the basis of its promotion efforts and market share. *See Boston Beer Co.*, 9 F.3d at 182 ("Among the factors this court generally looks to in determining whether a term has acquired secondary meaning are: (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture."). Here, the Beacon name and lighthouse logo have been used by the company for over a decade as the primary designator of its workers' compensation product. Beacon was formed in 1990 as the State Compensation Insurance Fund to write workers' compensation insurance for Rhode Island employers. To better compete, Beacon adopted its current name and lighthouse logo in June 1992. Since then, Beacon has been using "The Beacon Mutual Insurance Company," "Beacon Insurance," "The Beacon" and a

lighthouse logo as its marks. Beacon has extensively promoted its name and logo, and has acquired substantial market share in Rhode Island. (*See generally* Tr. of 2/28/05 at 60–108 (testimony of Michael Lynch, setting forth various promotional efforts).) Beacon immediately began to promote its new name and logo through advertising, sponsorships and civic participation throughout Rhode Island. Beacon increased its advertising and promotional expenditures between 1992 and 2001 from $4,600 to over $1 million per year, spending nearly $5 million during that period overall. (*Id.* at 101–04.) In 2001, Beacon's share of the Rhode Island market for workers' compensation insurance was approximately 66%, having peaked at 84.47%. (*Id.* at 105.) Beacon's drop in market share reflects the success of the company in that it brought competition back into the market for workers' compensation insurance. As a result of this long term use, extensive and broad-based promotional efforts, and large market share, it is reasonable to infer that a significant percentage of Rhode Islanders are familiar with the Beacon name and logo and associate it with a specific source for workers' compensation insurance. *See President and Trs. of Colby Coll. v. Colby Coll.-New Hampshire,* 508 F.2d 804, 808 (1st Cir.1975) ("[W]hile secondary meaning is shown by the success rather than by the mere fact of an enterprise's promotional efforts, the normal consequence of substantial publicity may be inferred."). Thus, based on Dr. Jacoby's survey evidence and the circumstantial evidence regarding length of use, promotion, and market share, the Court concludes that Beacon's marks have acquired secondary meaning.

**3.** OneBeacon argues that the names "Beacon Mutual Insurance Company" and "OneBeacon Insurance Group" should be compared here. However, this Court will follow the

### C. *Likelihood of Confusion*

Likelihood of confusion is "an essential element of a claim of trademark infringement." *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.,* 657 F.2d 482, 486–87 (1st Cir.1981). A plaintiff must prove that there exists "a substantial likelihood that the public will be confused as to the source" of the relevant goods or services. *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d 193, 194 (1st Cir.1980). The First Circuit has enumerated eight factors to be used as guides in assessing likelihood of confusion as to source or affiliation: "(1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of plaintiff's mark." *Astra Pharm. Prods.,* 718 F.2d at 1205. "No one factor is necessarily determinative, but each must be considered." *Id.* In this case, application of the eight factor test favors finding a substantial likelihood of confusion.

### 1. *Similarity of Marks*

The fonts Beacon and OneBeacon use in their marks are not identical.[3] (*See* Pl.'s Ex. 411, 412 (setting forth OneBeacon's and Beacon's marks).) Beacon uses a standard typeface font in a stylized orientation with the text placed to the right of the illustration. OneBeacon uses a modern-looking, rounded font, with the text centered below its illustration. Beacon uses a realistic depiction of a traditional lighthouse on land. OneBeacon's illustra-

First Circuit's lead and focus on the similarity of the visual marks. *See Beacon II,* 376 F.3d at 18.

tion is a suggestion of a lighthouse illuminating the sky, drawn in negative space and contained in an oval centered above the text. In Beacon's designation, the lighthouse appears in black and white and the text in blue lettering. In OneBeacon's designation, the lighthouse image appears in yellow and the text in blue. In Beacon's mark, the most prominent word is "beacon" and the word "the" is oriented perpendicularly to "beacon." In OneBeacon's mark, the words "one" and "beacon" are equally prominent, and there is no space between them.

In spite of their differences, Beacon's and OneBeacon's marks are fundamentally similar. The marks have two identical elements: use of the word "Beacon," and incorporation of the visual reference to a lighthouse. These marks are displayed without other names, logos, or source-identifying designations that would help to differentiate them. *See Beacon II,* 376 F.3d at 18 ("The first factor, similarity of marks, weighs in Beacon Mutual's favor. This factor is evaluated based on the [ ] designation's total effect. Here, the marks use different fonts and colors, but a factfinder could reasonably find the total effect to be similar.") (internal quotation marks and citation omitted).

### 2. *Similarity of Goods*

Beacon sells only workers' compensation insurance to employers within the state. Beacon presently insures approximately 14,500 employers. (Tr. of 2/28/05 at 120 (testimony of Michael Lynch).) OneBeacon, on the other hand, offers property, casualty and other forms of commercial insurance (including workers' compensation insurance) in New York, New Jersey, and the six New England states. In 2004, OneBeacon had twenty-four workers' compensation policies in all of Rhode Island. (Tr. of 3/3/05 at 102 (testimony of Roger Pare, OneBeacon Branch Manager).) While OneBeacon sells other insurance products besides workers' compensation, and workers' compensation makes up only a small part of its business, the workers' compensation insurance coverage that is offered by OneBeacon in Rhode Island is the same as that offered by Beacon. (Tr. of 2/28/05 at 123 (testimony of Michael Lynch, citing R.I. Gen. Laws § 28–36–5).) Thus, the Court concludes this factor weighs in favor of Beacon. Both Beacon and OneBeacon deal in insurance, and both parties specifically offer workers' compensation insurance. *See Beacon II,* 376 F.3d at 18 ("The second factor, similarity of goods and services, also favors Beacon Mutual. OneBeacon conceded this point in its summary judgment papers before the district court and thus has abandoned any argument to the contrary.").

### 3. *Channels of Trade, Advertising, and Classes of Prospective Purchasers*

Employers with at least one employee in Rhode Island must purchase workers' compensation insurance. R.I. Gen. Laws § 28–29–6. The majority of Rhode Island employers who purchase workers' compensation insurance are small businesses who employ less than five people. (Tr. of 2/28/05 at 139 (testimony of Michael Lynch).)

▮ Every insurance broker licensed by the State of Rhode Island is an agent of Beacon. (Tr. of 2/28/05 at 132.) All insurance offered by OneBeacon, in contrast, is sold exclusively through the company's independent insurance agents. (*Id.* at 133.) Each of these agents in Rhode Island is also an agent for Beacon. (*Id.*) Beacon offers its workers' compensation insurance through agents, as well as through direct sales. (*Id.* at 132.) OneBeacon restricts workers' compensation offerings to those who purchase other types of coverage. (Tr. of 3/3/05 at 109.) The rates OneBeacon charges for workers' compensation

coverage are generally the same as Beacon's rates.[4] (Tr. of 2/28/05 at 124.)

The parties' channels of trade, advertising, and classes of prospective purchasers weigh against Beacon. Workers' compensation insurance is a costly product generally purchased in consultation with licensed insurance agents. Those agents know the difference between OneBeacon and Beacon. Meanwhile, OneBeacon does not advertise its workers' compensation insurance in Rhode Island. Finally, the overlapping customers are business owners or individuals charged with purchasing workers' compensation insurance on behalf of their employers. Thus, the relevant class of consumers is sophisticated and has a professional incentive to make informed judgments.

### 4. *Actual Confusion*

Shortly after OneBeacon's name change, Beacon became aware of numerous instances of apparent confusion. (*See generally* Tr. of 2/28/05 at 149–217; Tr. of 3/1/05 at 16–85 (testimony of Michael Lynch, setting forth various instances of confusion).) Rhode Island employers, employees, vendors, doctors, court personnel and others have all demonstrated confusion over the relationship between the two companies.

Beacon has received checks from Rhode Island employers for premiums on One-Beacon policies, letters from employers meant for OneBeacon, and telephone and email inquiries indicating confusion about the distinction between the two companies. Beacon has also received medical records, physician letters, health insurance claim forms, and statements from health care providers intended for OneBeacon. In addition, Beacon has received correspondence intended for OneBeacon from third party insurance companies, as well as from attorneys and workers' compensation court personnel. The reverse is also true: One-Beacon has received documents intended for Beacon. Beacon has summarized much of this evidence in a "confusion matrix," which is further discussed below.

 OneBeacon has challenged the admissibility of much, if not all, of Beacon's evidence of actual confusion (*see* Def.'s Mot. in Limine to Exclude Evidence of Confusion), and some discussion of the

---

**4.** OneBeacon retained the services of Jessica Pollner, Ph.D., to determine whether there was a likelihood of confusion between One-Beacon and Beacon among OneBeacon agents in Rhode Island who produce commercial insurance policies. OneBeacon seeks to have the testimony of Dr. Pollner admitted as expert testimony to the effect that the results of the survey she conducted demonstrate a lack of likelihood of confusion among One-Beacon agents in Rhode Island. Beacon filed a motion to exclude this testimony and the Court conducted a *Daubert* hearing in the course of the trial, reserving ruling until the issuance of this opinion. This Court grants Beacon's motion for the following reasons: First, the Court does not need an expert to testify to the non-startling conclusion that OneBeacon agents in Rhode Island are not confused between OneBeacon and Beacon. *Cf. United States v. Sebaggala*, 256 F.3d 59, 65 (1st Cir.2001). Second, Dr. Pollner's methodology raises a number of questions as to the reliability of her conclusions. As just one example, after receiving responses from only forty-eight of the 140 agents from whom she sought responses (for a response rate of 34%), Dr. Pollner's primary effort to verify the representativeness of the sample was to ask One-Beacon itself whether the forty-eight agents were representative of the larger group. This Court concludes that such methodology is not sufficiently rigorous to meet the requirements of Rule 702 of the Federal Rules of Evidence. (*Cf.* Pl.'s Mem. for Exclusion at 14 (pointing out that the Guidelines for Statistical Surveys issued by the former U.S. Office of Statistical Standards provide that, in the case of probability samples, "[p]otential bias should receive greater scrutiny when response rate drops below 75%" and "[i]f the response rate drops below 50%, the survey should be regarded with significant caution").)

legal framework which guided this Court's rulings during trial is in order. Where Beacon sought to introduce evidence of actual confusion on the part of a member of the public (as manifested by behavior, rather than a statement such as "I'm confused") via the live testimony of an employee (for example, a receptionist testifying to someone calling Beacon looking for car insurance, which OneBeacon sells but Beacon does not), the testimony was ruled admissible as non-hearsay since it was not being offered for the truth of the matter asserted.[5] Where Beacon sought to introduce evidence of actual confusion on the part of a member of the public (as manifested by a statement equivalent to: "I'm confused") via the live testimony of an employee, the testimony was admissible under the then-existing state of mind exception to the hearsay rule.[6] However, Beacon's attempt to admit its "confusion matrix," either directly or via the testimony of a corporate officer, could not survive OneBeacon's objection. The matrix is hearsay (i.e., the document states that someone said, in effect, "I received a letter that indicated confusion on the part of the author"). The business record exception is not available because the matrix was prepared by Beacon in anticipation of litigation. *See Source Services Corp. v. Source Telecomputing Corp.*, 635 F.Supp. 600, 612 n. 9 (N.D.Ill.1986). Nor can Beacon overcome OneBeacon's objection by arguing the matrix constitutes a recorded present sense impression of another's then-existing mental state. *See Ocean Bio–Chem, Inc. v. Turner Network Television, Inc.*, 741 F.Supp. 1546, 1559 (S.D.Fla.1990). Finally, the Court declined to admit the matrix as a recorded present sense impression of non-hearsay behavior indicating confusion because the matrix does not disclose the time between forming the impression and recording the information. *See United States v. Ferber*, 966 F.Supp. 90, 99 (D.Mass.1997) ("A present sense impression, in contrast, is admissible so long as it explains an event immediately after it happens.").

Defendant argues that the probative weight accorded the admitted evidence should be de minimus.[7] (*See* Def.'s Mot. in

5. *See Boston Athletic Assoc. v. Sullivan*, 867 F.2d 22, 31 (1st Cir.1989) ("Mickey Lawrence, president of Image Impact, reported in her affidavit that she had encountered a shopper at the Filene's department store who expressed surprise when Lawrence told her that defendants' shirt, which the shopper was wearing, was not an 'official' Boston Marathon shirt. The district court refused to consider this account, holding that it was inadmissible hearsay. We think that the account was not hearsay, however, because it was not 'offered in evidence to prove the truth of the matter asserted.' Fed.R.Evid. 801(c). The statement was made not to prove that the defendants' shirts were in fact officially authorized, but rather to show that the declarant, a member of the public, *believed* that they were officially authorized.") (emphasis in original); *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 133 (3d Cir.2004) ("In this case, the tellers described what they saw and the action they took with respect to customers who appeared

to be confused with respect to CFG and CNBEC. This is not hearsay.").

6. *See Citizens*, 383 F.3d at 133 ("Fed.R.Evid. 803(3) allows statements, otherwise excluded as hearsay, to be received to show the declarant's then-existing state of mind. To the extent that any of the customers' statements may be deemed hearsay, we believe Rule 803(3) would apply."); *Programmed Tax Sys., Inc. v. Raytheon Co.*, 439 F.Supp. 1128, 1131 n. 1 (S.D.N.Y.1977) ("[A]n exception [to the hearsay rule] is available for the statements of those 'declarants' who were describing to Kanofsky their 'then existing state of mind,' i.e., their confusion.").

7. Defendant also argues the evidence should be deemed irrelevant. However, the cases Defendant cites for this proposition are not particularly compelling. For example, in *Lang v. Ret. Living Publ'g Co., Inc.*, 949 F.2d 576 (2d Cir.1991), the Second Circuit held that evidence of 400 misdirected phone calls was not relevant because it only showed (at best) that "consumers erroneously believed

Limine to Exclude Inadmissible Hearsay.) The cases Defendant provides set out a number of reasons why Plaintiff's actual confusion evidence may be of limited probative worth. For instance, courts have refused to give much credence to actual confusion evidence similar to the misdirected communications here where: (1) the total number of misdirected communications represents a small portion of the total number of communications received, *see Therma–Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 632 (6th Cir.2002); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 269 F.3d 270, 299 (3d Cir.2001); (2) there is no evidence that the misdirected communications were the result of anything other than clerical error,[8] *see Therma–Scan,* 295 F.3d at 636; *Checkpoint,* 269 F.3d at 298; (3) the total amount of misdirected communications was small in relation to the total time the senior and junior user had been using the marks at issue, *see Therma–Scan,* 295 F.3d at 636; *Checkpoint,* 269 F.3d at 298–99; and (4) the testimony regarding the misdirected communications came from employees of the plaintiff, *see Checkpoint,* 269 F.3d at 298. All these reasons for giving limited weight to actual confusion evidence are present here, and the Court accordingly limits the probative weight accorded to evidence of actual confusion fitting into one or more of the preceding categories.

Plaintiff, however, points out that at least some of the misdirected communications not only were sent to the wrong address, but included the wrong name as well—thus indicating more than mere clerical error. Also, the relatively small number of incidents cannot be held against Plaintiff without accounting for the fact that Defendant has an admittedly small Rhode Island presence and Plaintiff has not had similar confusion problems with other insurers. Finally, Plaintiff points out that because "[a]ctual confusion is often taken to be the most persuasive possible evidence that there is a likelihood of confusion ... [e]ven a minimal demonstration of actual confusion may be significant." *Three Blind Mice Designs Co., Inc. v. Cyrk, Inc.,* 892 F.Supp. 303, 312 (D.Mass. 1995).

Furthermore, even if Plaintiff's actual confusion evidence is found to be de minimus, Plaintiff points out that it can prove likelihood of confusion independently. *See Nautilus Group, Inc. v. Icon Health and Fitness, Inc.,* 372 F.3d 1330, 1339 (Fed.Cir. 2004) (concluding that "it was improper for the district court to consider [ ] scant and ambiguous evidence of actual confusion in Nautilus's favor for purposes of granting a preliminary injunction," but nonetheless

---

that the *senior user* (Lang) was the source of the *junior user's* (Retirement Living) magazine," *id.* at 583 (emphasis in original). This was not sufficient because, according to the Second Circuit, in order to be relevant the evidence needed to show that "purchasers or prospective purchasers of Lang's products" believed the products "were produced by or affiliated with Retirement Living's magazine." *Id.* This Court, however, is not bound by such a limitation. *See Beacon II,* 376 F.3d at 10 (noting that the evidence of misdirected communications in this case could support the inference that Beacon's goodwill and reputation had been damaged). The Sixth Circuit,

in *Therma–Scan,* also found evidence of actual confusion to be irrelevant where the communications that had been misdirected to plaintiff made no mention of defendant's product, 295 F.3d at 635. Since at least some of the inquiries to Plaintiff here did mention products sold only by Defendant, this rationale for finding irrelevance is also not applicable.

8. In addition to the parties having similar names, they share similar addresses. Beacon is located at One Beacon Centre in Warwick, Rhode Island, while OneBeacon's headquarters is at One Beacon Street in Boston, Massachusetts.

upholding determination that there was a likelihood of confusion as to registered mark on the basis of plaintiff's strength of mark and similarity between the marks and products); *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1340 (11th Cir.1999) (stating that actual confusion evidence "is not a prerequisite" and finding a likelihood of confusion as to registered mark on the basis of plaintiff's strength of mark, similarity of the marks, and defendant's intent to copy).

In light of all the above, the Court concludes that the evidence of actual confusion presented by Beacon, while clearly not overwhelming, is sufficient to tip the scale in its favor as to this factor.

### 5. *Defendant's Intent*

OneBeacon (then known as "CGU Insurance") was sold to White Mountains Insurance Group, Ltd. ("White Mountains") in 2001 and OneBeacon adopted its current name and lighthouse logo in connection with that sale. (Tr. of 3/3/05 at 58–59.) The choice of name and logo resulted from a year-long process that culminated with a naming contest in which employees and agents submitted their proposals. (*Id.* at 67–71.) The name "One Beacon" was one of 2000 submissions. (*Id.* at 69.) It was chosen by senior management from among twelve finalists. (*Id.* at 70, 83.) The choice of the name was influenced by several factors, including the fact that (a) One Beacon Street in Boston was the long-standing address of the Company's corporate headquarters, which its employees and agents had come to refer to as "One Beacon," and (b) it connected the Company to its base in Boston and, more broadly, New England. (*Id.* at 71, 84.) Management of the company's new owner, White Mountains, endorsed the choice. (*Id.* at 84.) Throughout the naming process, the Company was aware of the existence of Beacon (*id.* at 92–93), which it did not view as an impediment to the adoption of "One-

Beacon" because it did not view the companies as being in direct competition (*id.* at 83) and the name had been cleared for use by outside counsel (*id.* at 81–82). Around the time that "OneBeacon" was emerging as the consensus choice for the new name, the Company's in-house design staff and an advertising consultant developed over fifty potential logos. (*Id.* at 84.) The chosen logo is a combination of a lighthouse and obelisk designed by the outside consultant. (*Id.* at 85–86.)

The seventh factor in the likelihood of confusion inquiry—the defendant's intent in adopting its mark—falls in OneBeacon's favor. In this case, the record is clear that OneBeacon adopted its name and logo in good faith, without intending to copy Beacon's marks or deceive relevant purchasers. However, as the Circuit Court pointed out, "[u]nder this circuit's precedents ... this factor usually matters only where an alleged infringer copied a mark in bad faith; a converse finding of good faith carries 'little weight.'" *Beacon II*, 376 F.3d at 19.

### 6. *Strength of Mark*

OneBeacon offered the following evidence at trial: A search of yellowpages.com showed fourteen companies using "beacon" in their names in Rhode Island. (Tr. of 3/3/05 at 117.) One of those companies was in the insurance/financial industry and also used a lighthouse logo. (*Id.*) In Massachusetts, 289 companies listed in yellowpages.com used "beacon" in their name. (*Id.* at 119.) Ten of those companies were in the insurance/financial industry, and five of those used a lighthouse logo. (*Id.*) In New York, there were 233 listings, including one company in the insurance/financial industry. (*Id.* at 120.) In Connecticut, there were 101 such listings, including three in the insurance/financial industry, one of which used a lighthouse logo. (*Id.*)

A search of the world wide web showed, nationwide, an additional thirty-four companies in the insurance/financial industry using "beacon" in their names, twenty-nine of which also employed a lighthouse logo. (*Id.* at 125.)

Beacon raised many legitimate challenges to the accuracy of this evidence. Nonetheless, after reviewing all the evidence and objections thereto, the Court finds that: (1) the word "beacon" has been used by companies nationwide; (2) many of the companies using the word "beacon" in their mark are in the financial services/insurance industries; and (3) it is not uncommon for these marks to include a lighthouse logo.

However, even given this finding, the Court concludes that Beacon's marks are strong marks. As the Court of Appeals stated in *Beacon II*:

> OneBeacon argues that the mark is weak because a yellow pages search shows that the term 'beacon' is used by other financial services companies in the Northeast. But none of the Rhode Island companies listed appear to be insurance companies and there is no evidence that any of the other companies do business in Rhode Island.

376 F.3d at 19 n. 5. And so the evidence remained after trial. Beacon has used its marks since 1992, has promoted them actively, and has gained renown in the field, as evidenced by Dr. Jacoby's consumer survey and Beacon's substantial market share. Thus, the strength of the marks weighs in Beacon's favor.

 Having reviewed the eight factors, the Court concludes Beacon has carried its burden of proving a likelihood of confusion. Defendant argues Plaintiff must directly prove harm to its goodwill or reputation. But this is not correct. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir.1992) (Selya, J.) ("[T]he district court erred in sug-

gesting that proof of actual harm to Nestle's goodwill was a prerequisite to finding a Lanham Trade–Mark Act violation. The Lanham Act contains no such proof-of-injury requirement. By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated. Hence, irreparable harm flows from an unlawful trademark infringement as a matter of law."). Plaintiff put on evidence of, *inter alia*, mistaken cancellations of coverage for failure to pay premiums, improper disclosure of confidential medical records, and delayed reimbursement of health care providers. (*See* Tr. of 2/28/05 at 90.) This evidence, which this Court accepts, provides independent support for concluding that Beacon's goodwill and reputation have been damaged. The next issue is remedy.

### III. *Remedy*

 The Lanham Act affords the Court the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116. Indeed, "an injunction is the standard remedy in unfair competition cases." 5 McCarthy § 30:2. While the Court has a "wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct," *Soltex Polymer Corp. v. Fortex Indus., Inc.*, 832 F.2d 1325, 1329 (2d Cir.1987) (quoting *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir.1983)), injunctive relief should be limited to the senior user's geographic market, *Citizens Fin. Group*, 383 F.3d at 132 ("[T]he senior user of a common law mark may not be able to obtain relief against the junior user in an area where it has no established trade, and hence no reputation and goodwill.").

OneBeacon has argued that it should not be enjoined from using its mark in Rhode Island, but rather should be allowed to cure the actionable confusion via disclaimers and, perhaps, a directed advertising campaign. The Court, however, is not convinced such a solution would be effective. First of all, the efficacy of disclaimers generally is in doubt. *See Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1315–16 (2d Cir. 1987) (recognizing "body of academic literature that questions the effectiveness of disclaimers in preventing consumer confusion as to the source of a product"); *see also* Jacob Jacoby & George J. Szybillo, *Why Disclaimers Fail*, 84 Trademark Rep. 224, 224 (1994) ("most disclaimers do not in fact eliminate the potential for confusion"). Second, OneBeacon has put on no evidence to suggest a disclaimer would be effective in this case. *See* Vincent N. Palladino, *Disclaimers Before and After HBO v. Showtime*, 82 Trademark Rep. 203, 218 (1992) (summarizing cases following *HBO* as standing for the proposition that a disclaimer "should not be ordered where plaintiff establishes a substantial likelihood of confusion, unless defendant shoulders the heavy burden of proving a disclaimer will effectively alleviate that substantial

likelihood"). Finally, because Beacon is the one doing the vast majority of advertising in Rhode Island, the burden to correct confusion via disclaimer would arguably fall to them.[9] Given that Beacon is not the creator of the actionable confusion in this case, it would be manifestly unfair to impose the burden of clearing up that confusion on it. In light of these concerns, the Court concludes that the only practical remedy that can meaningfully protect Beacon's mark is an injunction prohibiting OneBeacon from using the OneBeacon name and lighthouse logo in Rhode Island.

## IV. Rhode Island Law Claims

Beacon also seeks injunctive relief under its state law claims. Because this Court has already concluded that Beacon is entitled to the relief it seeks pursuant to resolution of its Lanham Act claims, there is no need to further address Beacon's state law claims.

## V. Conclusion

For the foregoing reasons, the Court hereby ENJOINS Defendant OneBeacon Insurance Group from using the OneBea-

---

9. This fact may be the source of OneBeacon's suggestion that it be permitted to avoid an injunction by implementing a directed advertising campaign. This Court, however, foresees needlessly difficult logistical issues involving the form, quantity, and duration of such proposed advertising. Moreover, such a campaign might actually make the problem worse. *See Jacobs v. Beecham*, 221 U.S. 263, 272, 31 S.Ct. 555, 55 L.Ed. 729 (1911) (Holmes, J.) ("To call pills Beecham's pills is to call them the plaintiff's pills. The statement that the defendant makes them does not save the fraud. That is not what the public would notice or is intended to notice, and, if it did, its natural interpretation would be that the defendant had bought the original business out and was carrying it on."); *see also* Jacob Jacoby, Margaret C. Nelson, & Wayne D. Hoyer, *Corrective Advertising and Affirmative Disclosure Statements: Their Potential for Confusing and Misleading the Consumer*, 46 J. Marketing 61 (1982) ("Studies on corrective advertising suggest that remedial messages may also fail to be correctly comprehended. Mazis and Adkinson (1976, p. 182) noted that 39% of their subjects misunderstood the corrective message they used, while Russo et al. (1981) obtained a median miscomprehension rate of 61% for corrective ads for 10 different products. In other words, remedial statements may be at least as confusing and misleading as the advertising they are designed to counteract."). Thus, the Court does not view directed advertising as an effective solution to the problem of confusion as to source in this case.

con name and lighthouse logo in Rhode Island.

IT IS SO ORDERED.